# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

STEVEN MADDOX,

    Plaintiff,

       v.

JEFFERSON PARISH SHERIFF'S OFFICE
DEPUTY GEOFFRY WALKER,

    and

JEFFERSON PARISH SHERIFF'S OFFICE
DEPUTY JUSTIN LABADIE,

    Defendants.

Civil Action No.: 2:22-cv-00495

Judge:

Magistrate Judge:

# COMPLAINT FOR DECLARATORY
# AND INJUNCTIVE RELIEF

## INTRODUCTION

1.      "'The Black community . . . fear(s) the Jefferson Parish Sheriff's Office.'"[1]  This fear is justified.  For decades, the Jefferson Parish Sheriff's Office ("JPSO") has targeted Black people with disproportionate police surveillance and scrutiny, repeatedly designating Black people in white neighborhoods as suspicious.

2.      For nearly three decades, Sheriff Harry Lee was the most powerful elected official in Jefferson Parish.  He embraced and promoted policing that targeted Black people.  When a spate of robberies broke out that attacked victims in their driveways, Lee "vowed to stop and question blacks driving 'rinky-dink cars' in white neighborhoods."[2]  On another occasion, after Hurricane Katrina caused a spike in crime, Lee stated that "[w]e know where the problem areas are.  If we see some black guys on the corner milling around, we would confront them."[3]  On yet another occasion, Lee told a TV reporter in an offhand comment that "[w]e know the crime is in the black community.  Why should I waste time in the white community?"[4]  Lee even sought to patrol "dangerous" neighborhoods—*i.e.*, *non-white* neighborhoods—in armored cars, given his stated views on crime perpetrated in Black neighborhoods.[5]

3.      Young Black people in white neighborhoods were a particular target for Lee's JPSO.  As Lee said at a press conference:  "If there are some young blacks driving a car late at

---

[1] John Simerman et al., *Jefferson Parish Sheriff's Office an Outlier on Body Cams as Criticism Swirls Around Deadly Force*, Times-Picayune / New Orleans Advocate (June 27, 2020, 6:00 PM), https://www.nola.com/news/crime_police/article_cb8b82da-b8a1-11ea-bfec-6bf1ae8b2595.html. (quoting Dr. Ashonta Wyatt).

[2] John Burnett, *Larger-than-Life Sheriff Rules Louisiana Parish*, NPR (Nov. 28, 2006, 11:52 AM), https://www.npr.org/templates/story/story.php?storyId=6549329.

[3] *Id.*

[4] *Id.*

[5] *Id.*

night in a predominantly white neighborhood, they will be stopped.  There's a pretty good chance they're up to no good."[6]

4.      This type of racialized policing is unfortunately still popular in Jefferson Parish, a predominantly white locality that grew largely due to post-World War II white flight from New Orleans.[7]  Jefferson Parish is where voters elected former Ku Klux Klan leader David Duke to be a state representative in 1989,[8] and it is where voters repeatedly re-elected Lee and his hand-picked successors Newell Normand and Joseph Lopinto.

5.      JPSO's history of racialized policing continues to the present day.  At the time of the events giving rise to this litigation, Plaintiff Steven Maddox was a Black high school student with no criminal history and no prior encounters with law enforcement.  Mr. Maddox was attempting to enter *his own home* on February 13, 2020 after track practice when he was stopped and detained by JPSO Deputies Geoffry Walker and Justin Labadie ("Defendants") for no reason other than the color of his skin.  Mr. Maddox was a Black minor who lived in a neighborhood populated by white families.

6.      As discussed in more detail below, Defendants intruded on Mr. Maddox's home, rushed upon Mr. Maddox while he was standing on private property (outside the front door of his family home), ordered him up against a wall, and prepared to frisk him.  Mr. Maddox's stepfather (Ivan Blow) opened the front door, saw the commotion, and told Defendants that Mr. Maddox lived at the house.

---

[6] Jamiles Lartey, *Sheriff's Tirade over Joe McKnight Shooting is His Personal Brand of Theater*, Guardian (Dec. 7, 2016, 3:19 PM), https://www.theguardian.com/us-news/2016/dec/07/sheriff-newell-normand-joe-mcknight-shooting.

[7] Frances Frank Marcus, *Louisiana Sheriff Backed After Racial Remark*, N.Y. Times (Dec. 23, 1986), https://www.nytimes.com/1986/12/23/us/louisiana-sheriff-backed-afterracial-remark.html.

[8] Burnett, *supra* note 2.

7.      After Mr. Maddox went inside, Defendants told Mr. Blow that they were responding to a 9-1-1 call describing a suspicious individual with two backpacks looking for cars to break into.

8.      This was a materially incomplete statement.  What the 9-1-1 caller *actually* reported was a suspicious individual who had two book bags, who was wearing a "white or grey hoody," and who was "walking around and looking at car doors."  The caller could not identify the race of the suspicious individual when asked by the 9-1-1 dispatcher.

9.      Mr. Maddox did not match the 9-1-1 caller's description.  Mr. Maddox was carrying two different bags—a backpack and a track bag, not two book bags.  He was wearing a neon green sweatshirt, not a white or grey hoody.  He was not acting suspiciously or looking at car doors.  He was simply standing outside the front door of his home, waiting for his stepfather to open it.

10.     When Mr. Maddox's family questioned Defendants' basis for their seizure of a minor on his family's property, Defendants vaguely blamed Mr. Maddox's neighbors.  But Mr. Maddox's neighbors knew that Mr. Maddox lived at his family home.  They would not have called 9-1-1 to report that Mr. Maddox was merely standing outside the very place he resides— something he did frequently after school.

11.     All that Defendants saw was a young Black man ringing the doorbell to his home after track practice.  Based on that alone, they assumed that Mr. Maddox was the purportedly suspicious person, rushed up behind him and ordered him to "get on the wall" to frisk him.  If Mr. Maddox were a young white man, Defendants would not have profiled him.

12.     Defendants' conduct violated Mr. Maddox's rights under the Fourth and Fourteenth Amendments to the U.S. Constitution.  Defendants did not have probable cause to

trespass on Mr. Maddox's property.  Nor did they have reasonable, articulable suspicion to frisk Mr. Maddox after trespassing on his property.

13.     Defendants' speculation was fueled by their bias against Black men.  In Defendants' view, Mr. Maddox's race was the most salient fact, despite the presence of other apparent facts proving that Mr. Maddox was not the purportedly suspicious person described on the 9-1-1 call.  Because of Defendants' focus on Mr. Maddox's race, a person who was purportedly suspicious *became* Black, a person who is circling cars somehow *became* a Black person standing outside a home and ringing a doorbell, and a person wearing a white or grey hoodie somehow *became* a Black man wearing a neon green hoodie.

14.     Had Defendants applied the most minimal effort required of their role as public officers, they would have realized that Mr. Maddox was nothing more than a high school student returning home from track practice.  Defendants would have continued searching for the individual with two book bags and a grey or white hooded sweatshirt.  Defendants would not have rested their decision to pursue Mr. Maddox on groundless suspicion motivated by racial bias about what type of people should live in certain types of neighborhoods.  Had Defendants done their job, they would never have trespassed onto Mr. Maddox's property or assaulted him.

15.     Mr. Maddox is, unfortunately, only one victim of many who experience this type of aggressive, involuntary interaction with police.  "Black men are disproportionately more likely to be victims of stop-and-frisk searches even though White men, when stopped, are more likely to be found with weapons."[9]  The impact of such encounters is significant:  they erode

---

[9] Lisa Bowleg, et al., *Negative Police Encounters and Police Avoidance as Pathways to Depressive Symptoms Among U.S. Black Men, 2015–2016*, 110 Am. J. Pub. Health S160, S161 (Supp. 2020) (footnotes omitted).

public trust and cause serious health consequences, including anxiety, depression, and sometimes post-traumatic stress disorder ("PTSD").[10]  This is especially true of minors.

16.    Mr. Maddox is experiencing these effects due to his treatment by Defendants.  He was afraid when riding his bike or walking home from school.  He is anxious.  He lives in fear of his safety from law enforcement officers.  He will live with the consequences of this incident for the rest of his life.  It will shape the way he moves in the world as a Black man.

17.    Mr. Maddox sought an apology for Defendants' actions.  On February 18, 2020, with his mother, Mr. Maddox contacted JPSO and requested an apology for the unlawful and discriminatory actions of the offending deputies.  JPSO refused to oblige.  Mr. Maddox and his mother tried again.  But JPSO consistently refused to apologize.  Instead, JPSO backed Defendants' conduct and continued to blame the encounter on Mr. Maddox's neighbors.  But Mr. Maddox's neighbors did not identify Mr. Maddox.  Nor are they law enforcement officers acting under the color of law.

18.    Unable to obtain an apology, Mr. Maddox is forced to resort to litigation. Mr. Maddox does not seek money.  He seeks a declaration that the actions of the Defendants that day violated his constitutional and civil rights, and an order requiring that Defendants formally apologize to him for their conduct and admit liability.[11]  Defendants had no probable cause to enter Mr. Maddox' property, and they had no reasonable suspicion to order him up against a wall to conduct a stop-and-frisk.

---

[10] Amanda Geller, et al., *Aggressive Policing and the Mental Health of Young Urban Men*, 104 Am. J. Pub. Health 2321, 2324–25 (2014) ("Although proactive policing practices target high-crime, disadvantaged neighborhoods, affecting individuals already facing severe socioeconomic disadvantage, our findings suggest that young men stopped by the police face a parallel but hidden disadvantage: compromised mental health.  We found that young men reporting police contact, particularly more intrusive contact, also display higher levels of anxiety and trauma associated with their experiences.").

[11] *See generally* Aaron Lazare, *On Apology* (2004) (discussing the power of apologies to generate goodwill and heal humiliation and indignities).

## PARTIES

19.    Plaintiff Steven Maddox resides in Marrero, Louisiana, within the Eastern District of Louisiana.  He is now an adult at college, but at the time of the events giving rise to this litigation, he was a minor.

20.    Defendant JPSO Deputy Geoffry Walker is sued in his individual and official capacities.

21.    Defendant JPSO Deputy Justin Labadie is sued in his individual and official capacities.

22.    At all times pertinent and relevant to this action, Defendants were employed as commissioned deputies by JPSO acting in the course and scope of their employment and under color of law.  Plaintiff alleges that Defendants are responsible for the injuries to Mr. Maddox as set forth herein.

## JURISDICTION AND VENUE

23.    This action is brought pursuant to 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments to the United States Constitution.  This Court has jurisdiction over Mr. Maddox's federal claims pursuant to 28 U.S.C. § 1331 and § 1343.

24.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Defendants are law enforcement officers who work in this District, and because the wrongful conduct at issue in this matter occurred wholly within this District.  *See* 28 U.S.C. § 1391(b)(2).

## FACTUAL ALLEGATIONS

**A.    The Jefferson Parish Sheriff's Office targets Black people as a law enforcement tactic.**

25.    Sheriffs have immense power in Louisiana.[12]  They enforce the law, run the jails, impose fines, and collect taxes.  Harry Lee, the long-time Jefferson Parish Sheriff, stated that "[t]he sheriff of [Jefferson Parish] is the closest thing there is to being a king in the U.S."[13]  Sheriffs in Louisiana "often hold greater political clout than mayors, parish presidents and businessmen—a power that derives in no small part from their ability to pursue criminal investigations of mayors, parish presidents and businessmen.  As [Lee] once put it, when asked why he declined to run for statewide office:  'Why would I want to be governor when I can be king?'"[14]

26.    This mentality—that the Sheriff of Jefferson Parish is a monarch and his deputies nobility—enables JPSO deputies to act with impunity, including when acting on their unapologetic belief that policing that disproportionately targets Black people is an effective law enforcement tactic.  Lee, the Jefferson Parish Sheriff for nearly 30 years, was overtly anti-Black, and wove such beliefs into JPSO policing tactics.  When a spate of robberies broke out targeting people in their driveways, Lee "vowed to stop and question blacks driving 'rinky-dink cars' in white neighborhoods."[15]  After Hurricane Katrina caused a spike in crime, Lee stated "[w]e know where the problem areas are.  If we see some black guys on the corner milling around, we

---

[12] Lisa Riordan Seville & Hannah Rappleye, *A Sheriff's Deputy Shot a 14-Year-Old Boy.  It Went Unreported for Months*, NBC News (July 16, 2020, 4:41 PM), https://www.nbcnews.com/news/us-news/sheriff-s-deputy-shot-14-year-old-boy-it-went-n1234057.

[13] Burnett, *supra* note 2.

[14] Nathaniel Rich, *The Preacher and the Sheriff*, N.Y. Times Mag. (Feb. 8, 2017), https://www.nytimes.com/2017/02/08/magazine/the-preacher-and-the-sheriff.html.

[15] Burnett, *supra* note 2.

would confront them."[16]  On yet another occasion, Lee told a TV reporter:  "We know the crime is in the black community.  Why should I waste time in the white community?"[17]

27.    Lee's blatantly racist views on policing extended to how he patrolled the Black community—with armored cars; such indignities were not visited on *white* neighborhoods.[18] But Black youth in white neighborhoods were a special kind of target for Lee:  "If there are some young blacks driving a car late at night in a predominantly white neighborhood, they will be stopped.  There's a pretty good chance they're up to no good."[19]

28.    The mentality that catalyzed Jefferson Parish's population growth—post-World War II white flight from New Orleans—kept Lee, his views, and his tactics popular:  "'[Lee's] popularity depends, to some extent, on the perception that he is a white man's champion, [that] he is holding back the black hordes that might otherwise threaten suburban bliss.'"[20]

29.    Consistent with this history, Jefferson Parish in 1989 elected former Ku Klux Klan leader David Duke to be its state representative.[21]  Voters in predominantly white Jefferson Parish re-elected Lee seven times—because those voters believed in his racialized policing tactics.[22]

---

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] Lartey, *supra* note 6.

[20]  Burnett, *supra* note 2 (quoting James Gill).

[21] *Id.*

[22] *Id.*

30.     As late as 2006, Lee expressed support for racialized policing tactics.  In describing his plan for lowering crime in Jefferson Parish, in 2006, Lee concluded: "We're only stopping black people."[23]

31.     Lee died in 2007.  But his racist views and his legacy live on.  By the time of his death, his racialized policing tactics were firmly integrated into the fabric of JPSO.  Lee left an indelible mark on the JPSO—its headquarters is named after him.[24]

32.     Lee hand-picked his successor, Newell Normand, his close aide and protégé.[25] Normand was re-elected three times, then resigned to become a radio host.  Normand was succeeded by the current Sheriff, Joseph Lopinto, who Normand endorsed and backed.

33.     Lopinto has called Normand and Lee "great role models" of his,[26] and Lee's daughter (a Jefferson Parish Councilwoman) endorsed Lopinto for Sheriff, further demonstrating the extent to which Lee's legacy and views are entrenched in the JPSO.[27]

34.     Lee's views continue to drive the behavior of JPSO officers.  While other major Louisiana law enforcement organizations have taken steps to change their policing tactics, "Jefferson [Parish] deputies follow starkly different rules—over stops, chases, use of force and the disciplinary process[.]"[28]

---

[23] Adam Nossiter, *Harry Lee, Outspoken Louisiana Sheriff, Dies at 75*, N.Y. Times (Oct. 2, 2007), https://www.nytimes.com/2007/10/02/us/02lee.html.

[24] Leslie Pariseau, *Why Have a Spate of Police Shootings in New Orleans Suburbs Been Ignored?*, Jacobin (June 9, 2020), https://jacobinmag.com/2020/06/jefferson-parish-modesto-reyes-police-brutality.

[25] Michelle Hunter, *Jefferson Parish Sheriff Newell Normand Says He's 'Going Out on Top'*, Times-Picayune (July 26, 2017, 4:00 PM), https://www.nola.com/news/crime_police/article_d2bc031d-617f-52ea-85fb-df44d0039826.html.

[26] Christopher Tidmore, *From Beating Lee to Becoming Sheriff, Newell Normand Retires*, La. Wkly. (July 31, 2017), http://www.louisianaweekly.com/from-beating-lee-to-becoming-sheriff-newell-normand-retires/. (quoting Lopinto).

[27] Erin Lowrey, *Timeline: A Review of the Jefferson Parish Sheriff Race*, Fox 8 News (Mar. 22, 2018, 7:30 AM), https://www.fox8live.com/story/37765513/timeline-a-review-of-the-jefferson-parish-sheriff-race/.

[28] Simerman, *supra* note 1.

35.     Until December 2021, for example, JPSO deputies did not wear body cameras. For years, "[JPSO] [was] the largest state law enforcement agency not to use body-worn cameras, and Lopinto [had] no plans to change that.  That increasingly [made] him an outlier: Over half of Louisiana sheriffs, and nearly every large police force in the state, now deploy them."[29]  It was only after bipartisan political calls and a video showing a JPSO deputy assaulting a woman that JPSO relented and Lopinto agreed to use body cameras.[30]

36.     Lopinto had stated that a precondition to his ordering the use of body cameras is legislation that would let him "discard video earlier than is currently allowed" as he would like to avoid having to answer "large-scale public records requests" typically used by news reporters.[31]

37.     This focus on secrecy and opacity is typical of Lopinto and JPSO.  On April 16, 2021, the Southern Poverty Law Center filed suit against Lopinto for his refusal to comply with a public records request seeking documents regarding excessive use of force by JPSO deputies.[32]

38.     A September 2021 analysis similarly confirms that Lee's overtly race-conscious views of policing persist:  records and data collected by *ProPublica* and WWNO/WRKF show that, in Jefferson Parish, "[m]ore than 70% of people who deputies shot at during the past eight years were Black, more than double the 27% of the population that is Black," and that "[s]eventy

---

[29] *Id.*

[30] Jennifer Crockett, *Both Republican, pro-police state rep candidates say JPSO body cameras are priority*, WDSU6 News, April 23, 2021, https://www.wdsu.com/article/both-republican-pro-police-state-rep-candidates-say-jpso-body-cameras-are-priority/36202556; Associated Press, *Jefferson Parish Sheriff Announces Body Cameras Coming*, U.S. News & World Report, Oct. 15, 2021, https://www.usnews.com/news/best-states/louisiana/articles/2021-10-15/jefferson-parish-sheriff-announces-body-cameras-coming; Azi Paybarah and Steve Eder, *2 Louisiana Deputies Are Arrested and Fired After Fatal Shooting*, N.Y. Times, Feb. 22, 2022 ("Sheriff Lopinto said the shooting was the first to be recorded by police body cameras since the Jefferson Parish Sheriff's Office started using them last year. The office adopted the technology after a video showing one of its deputies assaulting a woman attracted national news attention.").

[31] *Id.*

[32] Complaint, *Casteel v. Lopinto*, No. 816–723 (La. 24th J.D. C. filed April 16, 2021).

five percent of the people who died — 12 of 16 — after being shot or restrained by deputies during that time were Black men."[33]

**B.    The use of racialized policing tactics by Jefferson Parish Sheriff's Office deputies continues to this day, resulting in the killing of Black and brown men.**

39.    Since 2015, at least a dozen Black and Latino men have died while being pursued or arrested by JPSO deputies.  Three were juveniles.[34]

40.    In May 2018, for example, Keeven Robinson—a 22-year-old Black man—who, at the time was in the custody of four JPSO deputies, died of asphyxiation caused by "significant traumatic injuries to the . . . soft tissue of the neck."[35]  Similar to the murder of George Floyd, the four deputies claimed they had a brief struggle with Robinson, and that while they were arresting him, one of the officers "remembered kneeling on Robinson's head with at least one knee."  Robinson stopped breathing after being handcuffed.  The coroner classified Robinson's death as a homicide.  The four deputies each had been previously sued for civil rights violations.

41.    In another example, in March 2019, JPSO deputies fatally shot Daviri Robertson and Chris Joseph while they were sitting in their car in front of an IHOP.  The Sheriff stated the shooting was part of a drug sting, but there were no drugs or guns in the car.[36]

42.    Four months later, in July 2019, JPSO deputies shot and killed Leo Brooks, a 23-year-old Black man.  JPSO deputies claimed that Brooks was reaching for a pistol, but Brooks' family has stated that JPSO's reasons for the shooting were entirely manufactured.

---

[33] Richard Webster, *They Saw Me and Thought the Worst*, ProPublica (Sept. 24, 2021), https://www.propublica.org/article/across-the-parish-line.

[34] Seville, *supra* note 12.

[35] Samantha Schmidt, *Death of Black Louisiana Man During Arrest Ruled Homicide by 'Asphyxia,' Coroner Says*, Wash. Post (May 15, 2018), https://www.washingtonpost.com/news/morning-mix/wp/2018/05/15/death-of-louisiana-black-man-during-arrest-ruled-homicide-by-asphyxia-coroner-says/.

[36] Simerman, *supra* note 1.

43.     In yet another example, in March 2020, a JPSO deputy shot Tre'mall McGee, a 14-year-old unarmed Black minor.  JPSO authorities did not publicly disclose that a JPSO deputy had shot the teenager *for three months*.  The information was only disclosed by Lopinto when a member of the press questioned him about it at a news conference.  In his federal civil rights lawsuit, McGee has alleged that a JPSO deputy shot him when he was "defenseless, unarmed, on the ground, face-down, with his head facing the dirt."[37]

44.     These examples involve the use of deadly force, but JPSO deputies also use other types of force in targeting Black men.  In August 2020, for example, JPSO deputies brutalized 13-year-old Ferel Burke, who stated that a JPSO deputy "grabbed his hair and smashed his head into the pavement."[38]

45.     These examples are in addition to those that more generally show a pattern of JPSO deputies targeting Black and Latino residents of Jefferson Parish.  A JPSO deputy is being investigated after accusations that in September 2021 he held "a Black woman by her hair and slamm[ed] her head repeatedly into the pavement with such force that a witness to the Sept. 20 incident said it ripped several of . . . [her] braids from her scalp.  A 14-second video captured the incident in the New Orleans suburb where, for decades, Black residents have accused the Sheriff's Office of targeting them."[39]

---

[37] Complaint, at ¶ 16, *McGee v. Lopinto*, No. 21-0571 (E.D. La. Mar. 19, 2021); Simerman, *supra* note 1.

[38] Webster, *supra* note 33.

[39] Richard Webster, *Three Children Attacked a Black Woman.  A Sheriff's Deputy Arrived – and Beat Her More.*, ProPublica, Oct. 16, 2021, https://www.propublica.org/article/three-children-attacked-a-black-woman-a-sheriffs-deputy-arrived-and-beat-her-more; Richard Webster and Ramon Antonio Vargas, *Louisiana Deputy Who Slammed a Black Woman on the Pavement Was Named in Multiple Suits, Records Show*, ProPublica, Oct. 21, 2021, https://www.propublica.org/article/louisiana-deputy-who-slammed-a-black-woman-on-the-pavement-was-named-in-multiple-suits-records-show.

46.     In another example, a video captured how JPSO deputies and detectives at a March 2019 Mardi Gras parade attacked a Black man without provocation – and then concealed the truth by filing "cover charges" against the man "to cover up their use of excessive force and help shield the department from civil liability."[40]

47.     When considered alongside the historical context of Jefferson Parish and the views espoused by JPSO's long-standing leadership, these examples demonstrate a pattern, practice, and culture of violent, dangerous, and high-risk policing tactics that target Black men, particularly Black men present in white communities.

48.     JPSO is thus a more extreme version of a documented, national trend that shows that "Black communities . . . bear the disproportionate brunt of hyperpolicing, an aggressive form of policing characterized by intensive and extensive police surveillance, the 'noticing' of crime in racial/ethnic minority neighborhoods, and the designation of entire neighborhoods and residents as potential or actual criminals."[41]

C.     **Defendants trespass on Mr. Maddox's home without probable cause to conduct a stop-and-frisk of Mr. Maddox without reasonable suspicion.**

49.     Mr. Maddox is a recent graduate of John Ehret High School.  At the time of the events giving rise to this litigation, Mr. Maddox was still a high school senior.  He ran track for John Ehret High School.  He is attending college now, is majoring in biology, and he has hopes of running track professionally and becoming a teacher.

---

[40] Richard Webster, *He Was Filming on His Phone.  Then a Deputy Attacked Him and Charged Him With Resisting Arrest.*, ProPublica, Dec. 22, 2021, https://www.propublica.org/article/he-was-filming-on-his-phone-then-a-deputy-attacked-him-and-charged-him-with-resisting-arrest.

[41] Bowleg, *supra* note 9, at S160.

50.     Mr. Maddox's family lives in Jefferson Parish, in the Nottingham neighborhood of Marrero, Louisiana.  The neighborhood is a low-crime area comprised of single-family homes.  Mr. Maddox's home is in a cul-de-sac.  Several of Mr. Maddox's neighbors are white families.

51.     Mr. Maddox's home borders John Ehret High School, one of the largest public high schools in Louisiana.  Despite the predominantly white make-up of Jefferson Parish, the high school has a diverse student body.  Over half of its student population is Black, approximately 21% is White, 15% is Hispanic, and 8% is Asian.

52.     On February 13, 2020, Mr. Maddox was walking home from John Ehret High School after completing a full day of school and attending track and field practice.  Mr. Maddox was engaged in no crime.  He was not acting suspicious or odd.  He was simply following the same routine he followed every school day.

53.     That day, however, someone called 9-1-1.  The caller described a male who was "wearing two book bags" and a "white or grey hoody" "walking around and looking at car doors."  The caller said this person had "circled his house around . . . two times, looking at car doors."  The caller could not identify the race of the alleged suspicious individual.  When asked if he was "white, black, or Hispanic," the caller said he "couldn't tell if he was white or black or not."

54.     Upon arriving home, Mr. Maddox, who does not carry a house key with him, participated in his daily routine—ringing the doorbell to his home a few times and waiting for someone to answer.  As was typical, Mr. Maddox waited outside for a few minutes.

55.     As he waited, Mr. Maddox did not circle anyone's house.  He did not look at any car doors.  Mr. Maddox thought he heard his stepfather, Ivan Blow, unlock the door, so Mr. Maddox reached to open the door.

56.     It was at this time that Mr. Maddox heard someone's voice.  The words were inaudible and the voice unrecognizable.  Mr. Maddox assumed the voice belonged to a mailman or the Amazon delivery driver.  Mr. Maddox replied to the voice ("What happened?").  In response, Mr. Maddox heard the voice again.  But this time, he realized the voice was coming from a rapidly approaching police officer:  Deputy Walker.  At this point, Deputy Walker, who was accompanied by Deputy Labadie, was already on Mr. Maddox's driveway.  As both Defendants made their way quickly toward Mr. Maddox, he heard Deputy Walker yell at him to "get on the wall."  Mr. Maddox immediately obeyed.

57.     Deputy Walker rushed up behind Mr. Maddox.  He placed his hand against Mr. Maddox's back so as to keep him up against the wall of his family home, so as to conduct a stop-and-frisk.  During the trespass and subsequent stop, Mr. Maddox noticed that each Defendant was armed with a gun and a taser.

58.     Mr. Blow opened the front door.  Deputy Walker asked Mr. Blow if Mr. Maddox lived there.  Mr. Blow confirmed that he did.  Defendants then freed Mr. Maddox and let him go inside.

59.     Defendants told Mr. Blow that they had received a 9-1-1 call about a suspicious-looking person who had two backpacks and was trying to find something to break into.  Neither Defendant identified anything that Mr. Maddox did that triggered their suspicion.  Neither Defendant stated that a crime had occurred.  Realizing Defendants had detained Mr. Maddox merely because he was Black, Mr. Blow shut the door.

60.     What Defendants told Mr. Blow was not the full story.  The 9-1-1 caller did not know or identify the race of the alleged suspicious person he was reporting.  Nor did the 9-1-1 dispatcher identify the alleged suspicious person's race to Defendants when dispatching the

information.  The 9-1-1 caller did not describe the purportedly suspicious individual as trying to find something to break into.  Rather, the caller said that the individual had "circled his house around . . . two times, looking at car doors."  Defendants indicated that Mr. Maddox matched the description of the purportedly suspicious person.

61.    But Mr. Maddox did not match any aspect of the 9-1-1 caller's description.  The 9-1-1 caller (and the dispatcher) described the purportedly suspicious individual as wearing a white or grey hoodie.  Mr. Maddox was wearing a neon green sweatshirt.  The 9-1-1 caller said that the individual had circled his house and was looking at car doors, but Mr. Maddox was not doing that—he was standing outside *his own* house and waiting patiently at the front door.  The 9-1-1 caller said the individual was wearing two book bags, but Mr. Maddox was carrying one backpack and one track bag, not two book bags.  Nothing about Mr. Maddox's conduct was suspicious.  Indeed, Mr. Maddox was performing the same task he performed every other day he came home from school after track practice.  In Defendants' view, the only thing that made Mr. Maddox suspicious and that connected him to the 9-1-1 call was that he was Black and in the area.  They targeted Mr. Maddox for standing outside his family home.

62.    Mr. Maddox's mother, who had been on the phone with Mr. Blow when the incident occurred, immediately left work and rushed home.  Ms. Blow is a Gunnery Sergeant in the U.S. Marine Forces Reserve.

63.    Shortly after arriving home, Mr. Blow relayed to Ms. Blow and Mr. Maddox what Defendants told him:  that there was supposedly a suspicious-looking person in the neighborhood trying to find something to break into.

64.    Rather than acting on the information dispatched to Defendants—that there was an alleged suspicious individual with two book bags wearing a grey or white hooded sweatshirt

circling someone else's home and looking at car doors—Defendants assumed the suspicious individual was a Black individual with two different bags wearing a neon green sweatshirt standing outside Mr. Maddox's home and not looking at anyone's car door.  Mr. Maddox could not have been—and was not—the purported suspect.

65.     In the end, Defendants followed through on the same racialized policing tactics Lee and his successors revered:  "only stopping black people."[42]  *See supra* ¶ 30.

66.     Had Defendants applied the most minimal effort required of their role as public officers, this whole incident would never have happened.  But Defendants failed to do so and instead allowed their own racial bias to drive their unconstitutional conduct.

67.     After the incident, Ms. Blow called the non-emergency police department phone number.  She was connected to Sergeant Brian Brinser.  Ms. Blow politely explained what had happened to her son and requested an apology on his behalf.  Instead of providing an apology, Sergeant Brinser vehemently defended the actions of the deputies, stating that they were just doing their job.

68.     Mr. Blow then got on the phone with Sergeant Brinser, who then demanded that Mr. Blow state his age.  That information was irrelevant.  It was asked to infantilize Mr. Blow. When Mr. Blow declined to share his age, Sergeant Brinser abruptly hung up.

69.     On February 18, 2020, Ms. Blow wrote a letter to JPSO, stating that "[m]y son was negatively affected by this encounter and I feel that a formal apology . . . is an appropriate course of action."

---

[42] Nossiter, *supra* note 23.

70.    In response to Ms. Blow's letter, Sergeant Melissa Marion called Ms. Blow. Sergeant Marion similarly excused Defendants' conduct, defensively and antagonistically telling Ms. Blow to "blame your neighbors" and "give me a reason to apologize and I will."

71.    About a month after Mr. Maddox was frisked by Defendants, Ms. Blow noticed a JPSO SUV parked across her home in the cul-de-sac.  Ms. Blow had never seen a police car in the cul-de-sac before.  There were no crimes or reports of suspicious activity in the neighborhood that would have prompted JPSO deputies to park an SUV in the cul-de-sac.

72.    On June 18, 2020, Ms. Blow wrote a second letter to JPSO.  In that letter, Ms. Blow continued to express her frustration regarding the lack of an apology to Mr. Maddox for the events that occurred on February 13, 2020.  Her letter stated that "it is now almost four months later and there has been no apology."

73.    Shortly after Ms. Blow mailed her second letter to JPSO, she again noticed a JPSO SUV in the cul-de-sac, parked across from her home.  Again, there were no crimes or reports of suspicious activity in the neighborhood that would have prompted JPSO deputies to park an SUV in the cul-de-sac.

**D.    Mr. Maddox's pain and suffering is substantial and enduring.**

74.    Defendants' conduct has altered Mr. Maddox's life.  After the incident, Mr. Maddox no longer felt safe and comfortable walking home from school.  He is anxious.  He often called Ms. Blow during his walk home to ensure that he returned safely and without harassment from JPSO deputies.  He has also altered his route home so that he no longer enters his home through the front door.

75.    Mr. Maddox's fears, anxiety, and trauma are a predictable consequence of being targeted by law enforcement for the color of his skin.  There is a scientific consensus that police interactions with youth have significant, long-lasting, and adverse mental health effects.

Negative experiences by youth with law enforcement officers often predict "emotional distress, trauma, and stigma, particularly as acts of officer intrusiveness"—e.g., a frisk combined with a stop combined with harsh language—"accumulate[] within a given stop."[43]  Police stops of Black and Latino youth have been statistically "associated with harmful outcomes for" those youth, including "psychological distress" and even increased delinquent behavior *after* the stops occur.[44]

76.     When negative encounters between law enforcement and youth are tinged with racism, scientific analyses demonstrate a causal relationship between "the impact of events widely perceived to reflect structural racism" and the mental health of Black Americans, such that negative and discriminatory encounters with police cause "large and pervasive" negative mental health consequences among Black Americans.[45]  Given that "Black youth . . . are stopped, interrogated, and arrested by the police at higher rates than White youth," the mental health effects on Mr. Maddox are palpable.[46]

**E.     The Court should hold that Mr. Maddox's claim is timely filed under federal civil rights law.**

77.     Defendants trespassed on Mr. Maddox's family property and seized him on February 13, 2020.  Mr. Maddox's suit is timely filed under federal civil rights law.

---

[43] Dylan B. Jackson, et al., *Police Stops Among at-Risk Youth: Repercussions for Mental Health*, 65 J. Adolescent Health 627, 631 (2019).

[44] Juan Del Toro, et al., *The Criminogenic and Psychological Effects of Police Stops on Adolescent Black and Latino Boys*, 116 PNAS 8261, 8266–67, 8261 (2019) ("Four waves of longitudinal survey data demonstrate that contact with law enforcement predicts increases in black and Latino adolescents' self-reported criminal behaviors 6, 12, and 18 months later.  These results were partially mediated by psychological distress.  The younger boys are when stopped for the first time, the stronger these relationships.").

[45] Jacob Bor, et al., *Police Killings and Their Spillover Effects on the Mental Health of Black Americans: A Population-Based, Quasi-Experimental Study*, 392 Lancet J. 302, 310–311 (2018).

[46] Jocelyn Smith Lee & Michael Robinson, *"That's My Number One Fear in Life.  It's the Police": Examining Young Black Men's Exposures to Trauma and Loss Resulting from Police Violence and Police Killings*, 45 J. Black Psychology 143, 145 (2019) (citations omitted).

1.    **Federal law precludes application of Louisiana's one-year statute of limitations.**

78.    Because federal law prohibits application of Louisiana Civil Code article 3492 in federal civil rights actions, "a federal court should look elsewhere in state law for an appropriate limitations period."[47]

79.    The purposes of the federal civil rights laws are to compensate people whose civil rights have been violated and to prevent "the abuse of state power."[48]  The historical catalyst for the Civil Rights Act of 1871—which created the § 1983 cause of action—was (1) "the campaign of violence and deception in the South, fomented by the Ku Klux Klan, which was denying citizens their civil and political rights," and (2) "the refuge that local authorities extended to the authors of these outrageous incidents[.]"[49]

80.    "Litigating a civil rights claim requires considerable preparation."[50]  Application of Louisiana's one-year liberative prescriptive period for delictual actions to § 1983 claims would contravene the federal policy underlying the Civil Rights Act.  Louisiana's liberative prescriptive period "fails to take into account [the] practicalities that are involved in litigating federal civil rights claims and policies that are analogous to the goals of the Civil Rights Act."[51]

81.    The modern development of qualified immunity doctrine has imposed an additional "huge hurdle for civil rights plaintiffs[.]"[52]  The hurdle is particularly challenging because "[m]odern qualified immunity doctrine . . . has proven impossible to apply with

---

[47] *Burnett v. Grattan*, 468 U.S. 42, 54 (1984).

[48] *Id.* at 53.

[49] *Wilson v. Garcia*, 471 U.S. 261, 276 (1985).

[50] *Burnett*, 468 U.S. at 50–51.

[51] *Id.* at 50.

[52] Jay Schweikert, *Qualified Immunity: A Legal, Practical, and Moral Failure*, CATO Inst. Pol'y Analysis No. 901 (Sept. 14, 2020), https://www.cato.org/sites/cato.org/files/2020-09/pa-901-update.pdf.

predictability or consistency. Indeed, there is perhaps no other Supreme Court doctrine that has engendered as much confusion and division among lower court judges as the Court's amorphous instructions on when a given right is clearly established, as both judges and commentators have recognized."[53]

82.    Moreover, police misconduct has considerable consequences for victims, making preparation of a federal civil rights lawsuit even more challenging. "[T]he reality is that for many victims of police misconduct, one year is not nearly enough time to file a federal lawsuit."[54] Victims of police misconduct experience socio-emotional problems as a result of their trauma, including feelings of isolation and distress exacerbated by [the] fact that most incidents of police misconduct are never publicly revealed.[55] Members of marginalized groups are disproportionately the victims of police misconduct, yet those groups are the ones who lack access to the civil justice system. "A victim of police brutality faces a stressful and unfair sprint to the courthouse if they are required to file a complicated federal civil rights claim within one year of the date of their injuries."[56] Fear of retaliation by police, shame, or judgment delays prospective plaintiffs from pursuing their claims in the quick manner required in Louisiana. These fears are particularly pronounced in minors, who are vulnerable members of society.

83.    These barriers and challenges to litigating federal civil rights claims are more pronounced in Louisiana because the Jefferson Parish Sheriff is the most powerful politician in the locality, *supra* ¶¶ 2, 25, and that power necessarily acts as a deterrent for potential plaintiffs

---

[53] *Id*.

[54] Dani Kritter, *The Overlooked Barrier to Section 1983 Claims: State Catch-All Statutes of Limitations*, CALIF. Blog (Mar. 2021), https://www.californialawreview.org/the-overlooked-barrier-to-section-1983-claims-state-catch-all-statutes-of-limitations.

[55] *Id*.

[56] *Id*.

who want to bring claims against the JPSO and its deputies, including people like Mr. Maddox, who was a minor at the time of the police misconduct giving rise to this litigation.

84.      In addition, the Louisiana State Legislature has over time allowed its enmity towards federal civil rights claims to color its statute of limitations decision making.  This violates federal law,[57] including the Fourteenth Amendment's guarantee of equal protection.[58]

85.      The Louisiana State Legislature extended the one-year statute of limitations to three years (in H.B. 724) for victims of child abuse, so as to provide those victims "a chance to recover and still have time to file suit."[59]  It also extended the one-year statute of limitations to two years (in S.B. 156) for victims of crimes of violence, so as to provide those victims with more time to deal with parallel criminal and civil proceedings and not have to face discovery associated with litigation after suffering trauma.[60]  And it extended the one-year statute of limitations to three years (in H.B. 556) for victims of sexual assault, so as to provide those victims with more time to cope with the trauma of their situation before having to decide whether to pursue civil litigation.[61]

86.      But the Louisiana State Legislature has consistently rejected proposals to extend the one-year liberative prescriptive period for delictual actions for *all* personal injuries, despite

---

[57] *See Burnett*, 468 U.S. at 53 ("To the extent that particular state concerns are inconsistent with, or of marginal relevance to, the policies informing the Civil Rights Act, the resulting state statute of limitations may be inappropriate for civil rights claims.") (footnote omitted).

[58] *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1410 (2020) (Sotomayor, J., concurring) (discussing the potential Fourteenth Amendment implications of Louisiana's exception to unanimous jury verdicts).

[59] *See* H.R. Civ. L. and Proc. Comm., Meeting Minutes on H.B. 724, at 3 (La. May 10, 1988).

[60] *See* Hearing Before the H.R. Civ. L. and Proc. Comm. on S.B. 156, at 22:58 (La. June 7, 1999), https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/1999/jun/0607_99_CL.

[61] *See* Hearing Before the H.R. Civ. L. and Proc. Comm. on H.B. 556, at 41:54 (La. April 12, 2016), https://house.louisiana.gov/H_Video/VideoArchivePlayer?v=house/2016/apr/0412_16_CL; S. Judiciary A Comm., Meeting Minutes on H.B. 556, at 6 (La. May 17, 2016); Hearing Before the S. Judiciary A Comm. on H.B. 556, at 28:39, (La. May 17, 2016), https://senate.la.gov/s_video/videoarchive.asp?v=senate/2016/05/051716JUDA_0.

the similarities between the physical and emotional injuries suffered by victims of child abuse, crimes of violence, and sexual assault and those who suffer other types of personal injuries, including those brought on by police misconduct.

87.    In one example (S.B. 83), former Louisiana State Senator Daniel ("Danny") Martiny—the former Louisiana Senate Majority Leader (from 2012 to 2020), the longest continuous-serving Republican in the Louisiana State Legislature, the Chairman of the Senate Republican Legislature Delegation, and the former Chairman of the Senate Judiciary B Committee (from 2008 to 2012)—stated during the hearing discussing the proposal to extend the one-year period that "90% of what I do for a living is defend police departments," and he described how defending law enforcement in § 1983 cases would become more challenging if the time period were extended for suits.  While the bill ultimately died, the final version of the bill proposed a two-tier liberative prescriptive period:  it retained a one-year liberative prescriptive period for claims against the State of Louisiana "or one of its departments, agencies, offices, or political subdivisions," but extended the period to two years for all other delictual actions.[62]  This bill failed to succeed, and today the prescriptive period remains one year.

88.    Senator Martiny's law firm defends Louisiana law enforcement officers,[63] and his firm's "biggest client, bar none, is the Jefferson Parish Sheriff's Office. . . .  From 2005 to 2016, the Jefferson Parish Sheriff's Office and its insurance company paid Martiny's firm $7.8 million

---

[62] *See* Louisiana Legis. Fiscal Off., Fiscal Note on S.B. 83 (2016), http://www.legis.la.gov/legis/ViewDocument.aspx?d=997064.

[63] *See* Rebekah Allen, *Louisiana Legislators Are Earning Big Money from Government Agencies – but Don't Have to Disclose It All*, ProPublica (April 13, 2018, 5:00 AM), https://www.propublica.org/article/louisiana-legislators-are-earning-big-money-from-government-agencies-but-dont-have-to-disclose-it-all.

in attorneys' fees and costs, according to public records."[64]  The Jefferson Parish Sheriff, Joseph

Lopinto, worked for Martiny's law firm until he was elected Sheriff.[65]

89.    Given the challenges involved in preparing and prosecuting civil rights litigation,

the fear and trauma that deters people like Mr. Maddox from filing civil rights suits against law

enforcement officers, the Louisiana State Legislature's demonstrated bias in favor of law

enforcement and against federal civil rights claimants, and the outlier nature of Louisiana's one-

year statute of limitations period for federal civil rights claims, federal law prohibits application

of Louisiana's one-year liberative prescriptive period to federal civil rights claims.

90.    The Supreme Court has specifically "disapproved the adoption of state statutes of

limitation that provide only a truncated period of time within which to file suit, because such

statutes inadequately accommodate the complexities of federal civil rights litigation and are thus

inconsistent with Congress' compensatory aims."[66]  The Supreme Court has thus invalidated, for

example, application of a six-month statute of limitations to federal civil rights claims brought

under 42 U.S.C. § 1983.[67]  The Second Circuit has similarly held that federal law precludes

application of a one-year statute of limitations to § 1983 claims.[68]  Other courts have also held

that application of a one-year statute of limitations to federal civil rights claims violates federal

law.[69]

---

[64] *Id.*

[65] *Id.*

[66] *Felder v. Casey*, 487 U.S. 131, 139–140 (1988).

[67] *Burnett*, 468 U.S. at 50.

[68] *Okure v. Owens*, 816 F.2d 45, 48–49 (2d Cir. 1987), *affirmed on different grounds*, *Owens v. Okure*, 488 U.S. 235, 236 (1989).

[69] *See Mason v. Owens-Illinois, Inc.*, 517 F.2d 520, 522 (6th Cir. 1975) ("This one year period, urged here by Owens-Illinois, applies only to action taken by the Ohio Civil Rights Commission itself, and hardly seems

      **2.**     **Louisiana law suspends the liberative prescriptive period in cases involving abuse of a minor, such as this case.**

91.     In cases involving abuse of a minor, the liberative prescriptive period is "suspended until the minor reaches the age of majority," and at that point the minor-turned-adult has a liberative prescriptive period of *three* years to file his action.[70] Abuse of a minor is defined in Louisiana law to mean any of certain acts "which seriously endanger the physical, mental, or emotional health and safety of [a] child." The acts include "[t]he infliction, attempted infliction, or, as a result of inadequate supervision, the allowance of the infliction or attempted infliction of physical or mental injury upon the child by a parent or any other person."[71]

92.     Defendants' conduct inflicted or attempted to inflict physical or mental injury on Mr. Maddox—who was then a minor—and such conduct seriously endangered Mr. Maddox's mental and emotional health and safety. *Supra* ¶¶ 10–11. Accordingly, the abuse of a minor exception to the one-year liberative prescriptive period for delictual actions applies to Mr. Maddox's claims.

## FIRST CAUSE OF ACTION

## WRONGFUL SEARCH IN VIOLATION OF THE FOURTH AMENDEMNT UNDER 42 U.S.C. § 1983 (AGAINST ALL DEFENDANTS)

93.     Plaintiff hereby incorporates all other paragraphs of this Complaint.

94.     Defendants deprived Plaintiff of the rights, privileges, or immunities secured by the Fourth and Fourteenth Amendments to the U.S. Constitution by conducting a search of

---

applicable to an action under § 1981 by a private litigant."); *Johnson v. Davis*, 582 F.2d 1316, 1319 (4th Cir. 1978) (rejecting 1-year statute of limitations because the "constitutional tort remedy" that "was created to protect such paramount federal rights as the right to vote, the right of free speech, and the right to be free from invidious discrimination, should not be relegated in the Virginia scheme of limitation periods to a period of only one year"); *Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 239–40 (3d Cir. 2014) (refusing to apply Pennsylvania's two-year statute of limitations to an Establishment Clause challenge brought pursuant to § 1983).

[70] *See* La. Civ. Code art. 3496.1.

[71] La. Ch. Code art. 603(2)(a).

Plaintiff's home without a warrant or probable cause or exigent circumstances. Defendants

trespassed on Plaintiff's home without legitimate, legal justifications for doing so.

95.     At the time that Defendants conducted the wrongful search, they were acting

under the color of law. Defendants were wearing JPSO uniforms. They were armed. They

drove a JPSO SUV. They held themselves out as acting under the authority of JPSO. They

issued a verbal order to Mr. Maddox to get up against the wall of his family home.

96.     No reasonable officer in Defendants' position would have believed that probable

cause or exigent circumstances existed to detain Plaintiff.

**SECOND CAUSE OF ACTION**
**WRONGFUL SEIZURE IN VIOLATION OF THE FOURTH AMENDEMNT**
**UNDER 42 U.S.C. § 1983 (AGAINST ALL DEFENDANTS)**

97.     Plaintiff hereby incorporates all other paragraphs of this Complaint.

98.     Defendants deprived Plaintiff of the rights, privileges, or immunities secured by

the Fourth and Fourteenth Amendments to the U.S. Constitution by wrongfully seizing him

without reasonable suspicion.

99.     At the time that Defendants wrongfully seized Plaintiff, they were acting under

the color of law. Defendants were wearing JPSO uniforms. They were armed. They issued a

verbal order to Mr. Maddox to get up against the wall of his family home. They drove a JPSO

SUV. They held themselves out as acting under the authority of JPSO.

100.     Defendants seized Mr. Maddox. They exercised a show of authority that

restrained Mr. Maddox's liberty, and Mr. Maddox complied with that exercise of authority.

They also exercised physical force by placing their hands on Mr. Maddox while he was up

against the wall.

27

101.    No reasonable officer in Defendants' position would have believed that reasonable suspicion existed to detain Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against Defendants, and award the following relief:

a.    Declare that Defendants' conduct violated the Fourth and Fourteenth Amendments to the U.S. Constitution;

b.    Order that Defendants issue a formal, public apology to Mr. Maddox for their unlawful actions and admit liability;

c.    Award Plaintiff his reasonable attorneys' fees and the costs incurred in bringing this action; and

d.    Grant Plaintiff such other and further relief as the Court deems just and proper.

Dated: February 24, 2022                    Respectfully submitted,

                                                              _/ s / Stephanie Willis_
Richard J. Leveridge*                         Stephanie Willis, LA. Bar No. 31834
Adam H. Farra*                                  Nora Ahmed*
Alison D. Gaske*                                ACLU FOUNDATION OF LOUISIANA
Ethan H. Kaminsky*                          1340 Poydras Street / Suite 2160
  GILBERT LLP                                    New Orleans, LA 70112
700 Pennsylvania Avenue, S.E. / Suite 400   (504) 522-0628
Washington, D.C. 20003                     SWillis@LAACLU.org
(202) 772-2301                                   NAhmed@LAACLU.org
LeveridgeR@GilbertLegal.com
FarraA@GilbertLegal.com
GaskeA@GilbertLegal.com
KaminskyE@GilbertLegal.com

_(An * denotes that counsel's pro hac vice application is forthcoming.)_

_Counsel for Mr. Steven Maddox_